**WINDSOR SHIRT COMPANY**

v.

**NEW JERSEY NATIONAL BANK.**

**Civ. A. No. 90–4851.**

United States District Court,
E.D. Pennsylvania.

May 11, 1992.

Michael S. Poulos, Ernst & Young, Cleveland, Ohio, for movant.

Gregory M. Harvey, Morgan, Lewis & Bockius, Philadelphia, Pa., for Terence J. Fox, and Archer & Greiner, a Professional Corporation, movant.

## OPINION

CAHN, District Judge.

### I. *Background*

On December 1st, 1989, defendant New Jersey National Bank ("Bank") informed plaintiff Windsor Shirt Company ("Windsor") that it was ending its banking relationship with Windsor. The Bank called Windsor's Loan Agreement of November 18, 1988 ("Loan Agreement"), which was not due to expire until May, 1990, because it believed that Windsor had materially breached the Loan Agreement. The Bank demanded that Windsor immediately repay its remaining obligations under the Loan Agreement, $ 5.2 million, or face bankruptcy. Windsor agreed to repay $ 3.5 million in December through emergency liquidation of its Christmas inventory[1] in exchange for the Bank's promise to forbear from forcing Windsor into bankruptcy and to permit Windsor's management to sell the company. By February, 1990, Windsor had paid the Bank all of the $ 5.2 million it owed, and Windsor's management sold the company to Phillips Van Heusen ("PVH"), Windsor's former main supplier, for $ 2.00.

This suit was brought by Kenneth J. Bogdanoff ("Bogdanoff") and Judith Bogdanoff, the founders and sole shareholders of Windsor, on behalf of themselves and Windsor (who had assigned its rights against the Bank to the Bogdanoffs). Plaintiffs alleged various tort and contract claims, some of which were dismissed by this court during trial in response to a motion by Defendant pursuant to Fed. R.Civ.P. 50(a). Plaintiffs alleged that the Bank agreed to lend Windsor an additional $ 3 million over the credit line in the Loan Agreement, and breached that oral contract by refusing to make the alleged loan. Plaintiffs alleged that the Bank's refusal to

Paul R. Rosen, Neils Korup, Robert L. Grundlock, Spector, Gadon & Rosen, P.C., Philadelphia, Pa., for plaintiffs.

Karen Anne Pieslak, Gregory M. Harvey, Philadelphia, Pa., for defendant.

1. The Bank had a perfected security interest in this inventory.

fund the $ 3 million loan gave rise to damages resulting from the Bank's contract breach, tortious breach of contract, negligent misrepresentation, fraudulent conduct, and violation of its duty of good faith. Plaintiffs also alleged, in connection with the Loan Agreement, that the Bank breached the Loan Agreement and violated its duty of good faith. This court dismissed all of Windsor's claims except the allegations of breach of contract and violation of the duty of good faith in connection with the Loan Agreement. This court also dismissed the Bogdanoffs as parties to this suit, leaving Windsor as the sole plaintiff. *See* Order of November 15, 1991. The Bank also brought a counterclaim, based on the Loan Agreement, which would allow it to recover costs associated with the enforcement of the Loan Agreement.

This case was tried to a jury for 19 trial days from October 8, 1991 until November 15, 1991. In its answers to interrogatories, the jury found that Windsor had proven, by a preponderance of the evidence, that the Bank had violated the contractual provisions of the Loan Agreement.[2] The jury then awarded damages in the amount of $ 3.5 million for the loss suffered by Windsor as a result of the breach.[3]

Now before the court is Defendant's Motion for Judgment as Matter of Law or, in the alternative, For a New Trial.[4] The court heard oral argument on these motions on February 3, 1992. For the reasons set forth below, the Motion will be denied.

## II. *Standards*

### A. Standards for Granting Judgment as a Matter of Law

■ A court cannot enter judgment as a matter of law unless the party seeking the

judgment made a Rule 50(a) Motion at the close of all the evidence at trial. *See Keith v. Truck Stops Corp. of America*, 909 F.2d 743, 744 (3d Cir.1990); *Mallick v. International Brotherhood of Electrical Workers*, 644 F.2d 228, 233 (3d Cir.1981); Fed. R.Civ.P. 50(b).

> The specific grounds for [judgment as a matter of law] must be asserted in the motion for a directed verdict. If the issue was not raised in the motion for the directed verdict at the close of *all* the evidence, it is improper to grant the [motion] on that issue. The requirement that the specific issue be raised first in the motion for a directed verdict, before the issue is submitted to the jury, affords the non-moving party an opportunity to reopen its case and present additional evidence. Further, when a trial court decides an issue after it was properly submitted to the jury, it may deprive the non-moving party of [its] seventh amendment rights.

*Bonjorno v. Kaiser Aluminum and Chemical Corp.*, 752 F.2d 802, 814 (3d Cir. 1984), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986) (emphasis supplied) (citations omitted).

■ In deciding whether a Rule 50(b) motion should be granted, "[a] court must view the evidence in the light most favorable to the non-moving party, and determine whether 'the record contains the "minimum quantum of evidence from which a jury might reasonably afford relief." ' " *Keith*, 909 F.2d at 745 (citation omitted). *See also Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990); *Bhaya v. Westinghouse Electric*

**2.** Interrogatory Number 1 read:
> Has the plaintiff, Windsor Shirt Company, proved by a preponderance of the evidence that the defendant, New Jersey National Bank, violated the contractual provisions of the November 18th, 1988 Loan Agreement in the late fall of 1989?

N.T. Nov. 15 at 4088 (citations to the Record are in the form N.T. (date) at (page)).

**3.** Interrogatory Number 2 read:
> State in dollars the amount of damages, if any, Windsor Shirt Company proved by a

preponderance of the evidence it incurred as a result of the breach (which you have found to exist by virtue of your "yes" answer to Question Number 1), of the Loan Agreement. N.T. Nov. 15 at 4089.

**4.** On December 31, 1991, Fed.R.Civ.P. 50(b) was amended. Although the amendment did not change the substance of the rule, it substituted the term "Judgment As a Matter of Law" for the term "Judgment Notwithstanding the Verdict."

*Corp.,* 832 F.2d 258, 259 (3d Cir.1987), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989); *Grace v. Mauser–Werke GMBH,* 700 F.Supp. 1383, 1387 (E.D.Pa.1988). It is for this reason that "[n]ormally, when the evidence is contradictory, [judgment as a matter of law] is inappropriate." *Bonjorno,* 752 F.2d at 811 (citation omitted). The jury must weigh the evidence, if the evidence is in dispute, because "[e]valuation of witness credibility is the exclusive function of the jury." *Bhaya,* 832 F.2d at 262. *See also Bonjorno,* 752 F.2d at 811; *Grace,* 700 F.Supp. at 1387.

**B. Standard for Granting a New Trial**

■ "In general, the ordering of a new trial is committed to the sound discretion of the district court." *Bonjorno,* 752 F.2d at 812. *See also Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1348 (3d Cir. 1991); *Honeywell v. American Standards Testing Bureau, Inc.,* 851 F.2d 652, 655 (3d Cir.1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 787 (1989); *Feingold v. Raymark Industries, Inc.,* 1988 Westlaw 76114 at *3 (E.D.Pa. July 19, 1988); *Grace,* 700 F.Supp. at 1387. A new trial cannot be granted, however, merely because the court would have weighed the evidence differently and reached a different conclusion. *See Feingold,* 1988 Westlaw 76114 at *3; *Grace,* 700 F.Supp. at 1387. A court can only exercise its discretion to grant a new trial because the verdict was against the weight of the evidence when the failure to do so would result in injustice, or would shock the conscience of the court. *See Williamson,* 926 F.2d at 1352–53; *Feingold,* 1988 Westlaw 76114 at *3; *Grace,* 700 F.Supp. at 1388.

**III. *Defendant's Argument for Judgment As a Matter of Law***

**A. The "Important" Distinction Between a Company And Its Stock**

■ The Bank argues that this court should direct a verdict for the defendant, notwithstanding the jury's findings of fact, because as a matter of law, Plaintiff did not prove *any* damages during trial. De-

fendant's argument is based on its motion, made orally before the court as a supplement to its Rule 50(a) motion, that Plaintiff had introduced "no competent evidence in the record of damage to the company" as a result of the Bank's decision to call its loan to Windsor. N.T. Nov. 15 at 4026; *see also* Memorandum In Support of Defendant's Motion For Judgment or, in the alternative, For a New Trial ("Defendant's Memorandum") at 9. Defendant argues that the statements by witnesses called by Windsor and the Bank upon which Plaintiff relied in arguing its damages case to the jury all referred to the value of Windsor's stock, which was owned by the Bogdanoffs, and not the value of Windsor itself. *See* Defendant's Supplemental Brief In Reply ("Defendant's Supplemental Brief") at 2.

Defendant seems to be arguing that the this court should have granted a directed verdict at the Rule 50(a) stage of this trial because, although Windsor may have proven that the Bank's actions significantly affected the value of Windsor's stock, Plaintiff did not prove any connection between the value of Windsor's shares and the value of Windsor, the corporation. A review of Defendant's motion under Rule 50(a), Defendant's Memorandum, and Defendant's Supplemental Brief, reveal that Defendant has made *no* argument contradicting Plaintiff's evidence of the decline in value of Windsor's stock. Defendant is therefore basing its entire Rule 50(b) motion on the contention that a factfinder cannot infer damage to a corporation from a drop in the value of the corporation's stock caused by a contract breach by the corporation's bank. The court rejects this unsupportable argument.

It is beyond peradventure that the market capitalization of all the shares of a company's stock represents the approximate market value of the company. Admittedly, the more inefficient the market, the more divergence there may be between the market capitalization of a company, as represented by the sum of the market price of all its shares, and its "true" value, as measured from the perspective of a fully-informed buyer in a perfectly efficient mar-

ket. But those subtleties are the concern of academics and are irrelevant to the world of business: To a businessperson, the market capitalization of a company's stock is the company's market value.[5]

Defendant seems to be suggesting that, notwithstanding its proof of the effect of the Bank's actions on the market price of Windsor's stock, Windsor needed to provide the jury with evidence that there was, in late 1989, a reliable relationship between Windsor's share price and its value as a company. This court can find no case law supporting this proposition. The case law, in fact, clearly supports the opposite. *See In re Sunrise Securities Litigation*, 916 F.2d 874, 886 (3d Cir.1990) ("decreases in share value reflect decreases in the value of the company"), *citing Rand v. Araconda–Ericcson, Inc.*, 794 F.2d 843, 849 (2d Cir.), cert. denied,479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Gaff v. FDIC*, 828 F.2d 1145, 1150 (6th Cir.1987) ("diminution in the value of corporate stock constitutes a direct injury to the corporation").

In fact, Defendant's claim that none of the witnesses testified about value of Windsor before the Bank's alleged breach can only make sense if one misreads those parts of the record where witnesses for both parties discuss the value of Windsor and the value of Windsor's stock interchangeably. Contrary to Defendant's claims in its Supplemental Brief at 2, both Mr. Klatsky and Chandler Joyner, the Bank's valuation expert, discussed the value of Windsor without reference to the value of its stock throughout their testimony. *See, e.g.*, N.T. Oct. 23 at 1167 (Klatsky: "Well, if we bought the company [Windsor] on one day with a particular performance and a particular set of assets and a particular earnings potential versus

another day, the company is worth one thing one day and another thing another day."); N.T. Oct. 23 at 1185–86 (Klatsky describing Irving Winter's in-house analysis of PVH–Windsor deal at various purchase prices for "the company"); N.T. Nov. 13 at 3649 (Joyner's description of Winter analysis as "a way to buy the company"); N.T. Nov. 12 at 3383 (Joyner's reference to PVH's estimate of "the value of Windsor Shirt" in 1991); N.T. Nov. 12 at 3385 (Joyner's recalculation of PVH's equation with a new price/earnings ratio which results in a figure (to be compared with PVH's) which Joyner calls "equity value").

### B. The Problem of Proof of Damages to Windsor

Defendant's ultimate argument for Judgment As a Matter of Law appears in the middle of Defendant's Supplemental Brief when it contrasts the damages evidence presented by Windsor with the damages evidence recognized as sufficient by the Third Circuit Court of Appeals in *Franklin Music Co. v. American Broadcasting Companies, Inc.*, 616 F.2d 528 (3d Cir. 1980). Defendant's point, which was much more fully developed in oral argument before the court, is that Plaintiff did not offer any proof that the Bank's breach caused anything other than nominal damage to Windsor.[6] The Bank argues that the net effect of its breach was to demand repayment of $ 3.5 million on December 1st, 1989, instead of $ 5.2 million on December 30, 1989.[7] *See* N.T. Feb. 3 at 6. The Bank argues that Windsor had an obligation to prove to the jury the effect of demanding $ 3.5 million a month early: "[T]here is nothing in the record which shows any economic impact upon Windsor of the

---

**5.** This is clearly evidenced in the record by the definition of "market capitalization" offered by Bruce Klatsky, President of PVH: "[W]hat the market says our company is worth." N.T. Oct. 23 at 1198. According to Mr. Klatsky, PVH's market capitalization, for example, is calculated by multiplying the total number of PVH's outstanding shares by the average market price per share. *Id.*

**6.** This argument is perfectly logical (although factually flawed, according to the jury), and in

no way relies on any imaginary distinction between damage to Windsor as opposed to damage to the value of Windsor's stock. Obviously, if the Bank's breach only nominally damaged Windsor, it only nominally damaged the value of its stock.

**7.** Which is when, according to the Loan Agreement, the $5.2 million revolver in the Loan Agreement had to be paid down to zero.

bank's having required that 3.5 million be paid prior to December 30." N.T. Feb. 3 at 6. Defendant directs the court's attention to *Franklin Music* in order to illustrate the type of evidence our circuit requires in order to substantiate damages in a case where a company's value was diminished by the wrongful acts of another.

Defendant raises an important point. This court noted early in the case that Plaintiff's greatest obstacle would be establishing damages. *See* N.T. Oct. 8 at 245; *see also* N.T. Feb. 3 at 35–36. Plaintiff's damages strategy was to have the jury focus on two figures: the 7 or 9 million dollars it claimed the company was worth in early 1989, and the $ 2.00 for which the company was sold in 1990. *See* N.T. Nov. 14 at 3940, *citing* N.T. Oct. 23 at 1284. Defendant's damages strategy was two-pronged: It used Mr. Joyner to argue that Windsor was never worth 7 or 9 million dollars (*see, e.g.,* Defendant's Exhibit 247) and Carl Steidtmann to argue that regardless of Windsor's alleged value in early 1989, by late 1989 its performance was very poor, and its poor performance was in no way caused by the Bank's breach. *See* N.T. Nov. 13 at 3739.

 Defendant now advances the following argument: Even if Mr. Joyner was wrong and Mr. Klatsky was right about Windsor's value in early 1989, Plaintiff offered no proof to the jury that Windsor was worth anything more than a nominal amount on November 30, 1989, the day before the Bank breached.[8] Mr. Steidtmann testified that the entire men's clothing industry was suffering one of the worst business downturns in recent memory. *See* N.T. Nov. 13 at 3724–25, 3735. Mr. Steidtmann also testified that specific decisions made by Windsor were "blunders" that (a) placed it into a contracting market; (b) focussed it on a increasingly

unpopular product; and (c) placed it in direct competition with department stores. *See* N.T. Nov. 13 at 3728. It is reasonable to assume, argues the Bank, that the factors described by Mr. Steidtmann suggest that Windsor faced very different prospects in late 1989 than it did in early 1989. According to the Bank, Mr. Steidtmann's testimony might even substantiate Mr. Joyner's claim that by January 1990, Windsor, had it continued to exist, would have had even a greater "negative equity value" than it had in early 1989. *See* N.T. Nov. 12 at 3377.

It is possible that the jury accepted some or all of Mr. Steidtmann's opinions. Mr. Steidtmann was called as an expert on retail marketing, not on valuation. *See* N.T. Nov. 13 at 3713. Mr. Steidtmann persuasively described the dire condition of Windsor's market and he was very critical of Windsor's marketing strategy. Mr. Steidtmann, however, never put a number on how much, in his opinion, Windsor's value was depressed by the poor market for men's clothes and its own "blunders." Nor did Mr. Steidtmann offer an opinion on the value of Windsor just before the Bank's breach. His testimony could only go to the question of how well or poorly Windsor was doing in late 1989, and how good or bad its performance prospects would have been had the Bank not breached.

Most importantly, Mr. Steidtmann did not offer an opinion as to the percentage of decline in Windsor's value after December 1, 1989 that was attributable to the Bank's acts. Mr. Steidtmann's statement that none of the problems facing Windsor that he described in his testimony were caused by the Bank's breach may be true but is irrelevant. *See* N.T. Nov. 13 at 3739. The problems Mr. Steidtmann described, which were related to macroeconomic trends and

---

**8.** Another way of asking the damages question is whether Plaintiff proved to the jury what Windsor's value would have been in May 1990, which was when the Loan Agreement was due to expire. Both dates represent the value of Windsor had Plaintiff been able to enjoy the benefit of its bargain with the Bank, which is the standard for contract damages under New

Jersey law. *See Donovan v. Bachstadt,* 91 N.J. 434, 453 A.2d 160, 165 (1982) (compensatory damages for a breach of contract should put an injured party in as good a position as he would have been in, had performance been rendered); *see also B.F. Hirsch v. Enright Refining Co., Inc.,* 751 F.2d 628, 634 (3d Cir.1984).

marketing "blunders" dating from 1986 do not produce sudden, dramatic effects. According to Windsor, however, the decline in its value caused by the breach occurred very rapidly: Although Windsor was sold to PVH on February 9, 1990 (*See* N.T. Oct. 22 at 1089), its zero value after December 1 had been recognized by PVH and Bogdanoff as early as mid-December. *See* N.T. Oct. 22 at 1098 (Bogdanoff stating that he agreed in his first post-breach conversation with Klatsky to "give" Windsor to PVH since "it was assumed that there would be no book value by the end"); N.T. Oct. 23 at 1216 (Klatsky stating that in mid-December PVH determined that Windsor "wasn't worth very much at that time"). Thus, even if Mr. Steidtmann was correct that Windsor was doing poorly in December 1989 and would have done even more poorly in 1990, his testimony was irrelevant to the jury, which needed to know how much of Windsor's decline—from being a company with admittedly poor performance at the beginning of December to being a worthless company by mid-December—was attributable to the Bank.

Defendant argues that no one testified as to what percentage of Windsor's decline was attributable to the Bank's acts. *See* Defendant's Supplemental Brief at 2. The Bank argues that testimony from Mr. Klatsky that the Bank "hurt" Windsor by a "significant" amount cannot be used by the jury to calculate how much of Windsor's pre-breach value was destroyed by the breach. *Id.* ("[e]ven if the jury believed Mr. Klatsky that the Bank had "hurt" Windsor, plaintiff introduced no figures which would have permitted the jury to calculate damages ..."). At least one

number had been introduced, however: Both Bogdanoff and Mr. Klatsky testified that as a result of the Bank's actions, Windsor had no value. They testified, in effect, that the percentage of decline in value attributable to the breach was 100%.

Since Mr. Steidtmann did not offer his opinion of what percentage of the decline in Windsor's value after the breach was attributable to the Bank, and Plaintiff's witnesses did offer testimony on this question, Defendant cannot argue that the jury was given "no figures which would have permitted the jury to calculate damages." The jury had the figure of 100%, which it could accept, or reject, or modify, and it could apply that figure to whatever value of Windsor as of November 30, 1989 it chose to accept from the valuation opinions it heard. The jury was told by Mr. Klatsky that in early 1989 Windsor's book value was $ 4 million, and that with synergies PVH might have paid 7 to 9 million dollars for Windsor.[9] *See* N.T. Oct. 23 at 1200 & 1284. The jury returned a damages figure of $ 3.5 million, which is 87.5% of what Plaintiff claimed was Windsor's book value and between 38% and 50% of what Plaintiff claimed Windsor was worth to PVH in early 1989. It is not unreasonable to assume that the jury adopted Mr. Steidtmann's opinion and factored the grim retail news into its calculation of what Windsor was worth on November 30, 1989. This calculation would have allowed the jury to arrive at a figure of $ 3.5 million, and then attribute 100% of Windsor's decline from $ 3.5 million to zero between the date of breach and mid-December to the Bank's acts, thus generating a damages figure of $ 3.5 million.[10]

**9.** It is clear that Windsor possessed certain qualities that may have been valuable to PVH and no one else. *See* N.T. Oct. 23 at 1201. It is also obvious that while PVH is the only company that expressed a serious interest in buying Windsor, one cannot assume that if PVH did not buy Windsor, Windsor had no value. The jury could use PVH as a proxy for the market in order to set Windsor's price. Nonetheless, the jury also heard enough from the various witnesses that one can assume that while it could treat PVH as a proxy for the market, it would have to discount PVH's offer to take into ac-

count the premium over market value that PVH might have placed on Windsor.

**10.** In calculating Windsor's worth on November 30, 1989, the jury should not have factored in the marketing "blunders" Mr. Steidtmann attributed to Windsor because those blunders were strategy decisions that were put into motion "back in 1986" and therefore, one might presume, would have been known by a sophisticated investor like PVH and already factored into the early 1989 values PVH placed on Windsor. *See* N.T. Nov. 13 at 3728. Nor did the jury have any greater reason to adopt Mr. Joyner's

Defendant may still argue that even if the jury accepted Mr. Klatsky's value for Windsor, and multiplied that figure times a discount derived from Mr. Steidtmann's testimony, and then attributed 100% of the loss of that figure to the Bank, the jury's damages award is still not supported by sufficient evidence. The Bank argues that Plaintiff must do more than show that on one day Windsor was worth $ 3.5 million and then, within a month, it was worth almost nothing. The Bank argues, in fact, that Windsor must show *how* the Bank's breach caused Windsor's value to drop: After all, argued the Bank in court, the only significant effect of the breach was that Windsor had to give the Bank $ 3.5 million a month early. *See* N.T. Feb. 3 at 6.

The Bank points out that in *Franklin Music,* which involved a suit for by a retail music store for damages caused by breach of fiduciary duty and conspiracy, the plaintiff introduced evidence of lost earnings resulting from lost advertising rebates and a defendant's improper neglect of his duties, as well as evidence of the plaintiff's gross profit ratios, actual sales and losses, and sales growth before and during the period when the injury occurred. *See* Defendant's Supplemental Brief at 5–6. From this the Bank concludes that to "prove[ ] damages under the *Franklin Music* standard, Windsor might have introduced evidence of its profits, sales and losses and overall performance (or some other equivalent) both before and after the November 27—December 1, 1989 actions by the Bank." Defendant's Supplemental Brief at 7. The Third Circuit Court of Appeals did not require this in *Franklin Music;* nor did the District Court in its Memorandum and Order in *Franklin Music. See* Appendix to Defendant's Supplemental Brief in Reply at Exhibit A (hereinafter "*Franklin Music* Memorandum"). Both the District Court and the Third Circuit Court of Appeals relied upon traditional tests to determine the type of evidence which must be submitted to the jury. *See Ashcraft v. C.G. Hussey & Co.,* 359 Pa. 129, 58 A.2d 170, 172 (1948) ("reasonable quantity of information must be supplied ... so that the jury may fairly estimate the amount of damages from the estimate"); *see also Marrazzo v. Scranton Nehi Bottling Co.,* 422 Pa. 518, 223 A.2d 17, 21. (1966) (evidence must be sufficient to support verdict without resort to conjecture).

The only place where specific evidence relating to "general operations, profits or sales" is mentioned in *Franklin Music* is in the *Franklin Music* Memorandum where the district court discusses the plaintiff's proof of "business damages." *Franklin Music* Memorandum at 34. The discussion of business damages in the *Franklin Music* Memorandum makes sense, since in that case, Franklin Music alleged that its damages arose, in part, from losses suffered over a number of years caused by a countless number of injurious choices and actions by the defendant. *See Franklin Music* Memorandum at 33 (conspiracy damage assessment "could have been predicated on any number of specific acts of misconduct by the defendants").

This case is not factually similar to *Franklin Music* in several respects. Here we have a single act, not many; the period involved is very short, not four years; and most importantly, the damages have to do with the destruction of Windsor as a going concern, not business damages having to do with lost profits, or income opportunities. For example, in *Franklin Music,* the plaintiff claimed that one defendant injured the company by neglecting his responsibilities, and therefore, with regard to this allegation the plaintiff was entitled to produce evidence pertaining to "general operations, profits or sales." *Franklin Music,* 616 F.2d at 537 (*see, e.g.,* the discussion of the $ 25,000 of lost advertising revenues attributed to defendant's breach of fiduciary duty). In this case, the damage to Windsor had nothing to do with an employee or

---

"negative equity value" for January 1990 as an approximate value for Windsor on November 30, 1989 just because it may have adopted Mr. Steidtmann's opinion. Mr. Joyner's January 1990 valuation was based on the same methodology that generated a negative equity value for Windsor in early 1989: Since the jury (presumably) rejected Mr. Joyner's valuation of Windsor for early 1989, it had no reason to adopt it for late 1989 or 1990.

fiduciary causing Windsor to forego business opportunities over a period of time. In this case, the damages question had to do with the effect of the Bank's breach of the Loan Agreement on Windsor's value as a going concern. The value of a company as a going concern is related to its ability to operate as a limited liability corporation: To borrow money, to make contracts with suppliers and employees, to conceive of and carry out long and short term marketing and business strategies, and those other qualities that distinguish a corporation from merely a group of individuals who have legal title to some property. It is obvious that the sort of questions one must ask in order to determine whether a company's value as a going concern was affected by another's act have little to do with the sort of evidence adduced in *Franklin Music*.

There was direct testimony from Mr. Bogdanoff about the effect of the Bank's breach on Windsor as a going concern. When asked by Defendant's attorney about what difference in impact on Windsor there was between the Bank's calling the loan as opposed to the Bank waiting for Windsor to pay the revolver down to zero under the Loan Agreement, Mr. Bogdanoff responded as follows:

A: The difference in what actually occurred [and what was required under the Loan Agreement] was that the bank ... dictated who I could pay and who I couldn't pay and supervised every activity that was going on within my operation, denied me the opportunity to run my business and maybe get more sales. Denied me the opportunity to—to go out and pursue the equity which we had both agreed was a good idea.

I think there is a big difference.

Q: Well, first of all, the bank did not actually take over the management of Windsor Shirt Company; did it?

A: The bank specifically called every shot with regard to how we ran our company.

Q: Did the bank take over the management of Windsor Shirt Company and if so, tell me how?

A: The bank took over the control of the management of Windsor Shirt Company. We couldn't do anything without clearing it with Mr. Turko.[11]

. . . .

If we wanted to pay this supplier $12, we had to clear it through Mr. Turko. If we wanted to—before we went to issue a payroll, we had to clear it with Mr. Turko what the number was, what that payroll was. I would call that him being in control of managing our company.

N.T. Oct. 22 at 1091–92. There was testimony from Mr. Klatsky that the Bank's newly-acquired control of Windsor through Mr. Turko had a negative effect on Windsor. Mr. Klatsky was asked how PVH evaluated Windsor as an acquisition candidate after the Bank's breach:

A: [Windsor was in bad shape] ... [w]e did not want suppliers to stop shipping this company and hurt the company still further. The bank was not permitting, to the best of my recollection, Ken to make payments to some of these suppliers. And in doing so, in our judgment, they were further hurting the company.

N.T. Oct. 23 at 1217.

If the jury believed Mr. Bogdanoff's testimony recounting the statements made to him by Norman Strauss, the Bank's Chief Lending Officer, on December 1, 1989, then there was additional evidence that the Bank itself believed that it had materially affected Windsor's value as a going concern by calling the Loan Agreement:

[Bogdanoff]: He [Strauss] said "We want three and a half million dollars by the end of the month or we are going to blow this company up and we want a decision right now."

N.T. Oct. 10 at 15. The Bank, in making the statement that unless Windsor accepted its terms it would "blow the company up," reflected its belief that Windsor was a captive of the Bank. Obviously the Bank could not "blow the company up" on November 30, 1989, the day before the breach:

---

**11.** Paul Turko is a Senior Vice President of the Bank.

The only reason its threat was credible on December 1, 1989 was because *as a result of its actions* the Bank had placed Windsor in a position of extreme vulnerability. By definition, the value of a company, as a going concern, is negatively affected the moment it is placed into a position of extreme vulnerability by its major creditor.[12]

The Bank's argument that unless Windsor provided proof based on an analysis of a decline in Windsor's "general operations, profits or sales," it did not provide sufficient proof of damages is simply wrong. Furthermore, there was sufficient proof from which the jury could have reasonably calculated the amount of damage caused to Windsor as a going concern by the Bank's breach of the Loan Agreement. There is no reason to grant the Motion For Judgment As a Matter Of Law.

## IV. The Defendant Is Not Entitled To a New Trial

 This court can order a new trial even where judgment as a matter of law is inappropriate. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 735 (3d Cir.1988). A new trial may be granted in order "to avoid a miscarriage of justice" when the jury verdict is against the weight of the evidence. *Shanno v. Magee Indus. Enterprises, Inc.*, 856 F.2d 562, 567 (3d Cir.1988). Close scrutiny by the trial court is especially appropriate where the subject matter

does not lie "within the ordinary knowledge of jurors." *Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 90–91 (3d Cir.1960) (en banc), *cert. denied*, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960).

### A. The Jury Could Have Concluded From the Evidence That Windsor Never Admitted That It Was In Default

Defendant argues that the jury's findings are against the weight of the evidence because Windsor admitted at least two defaults of the Loan Agreement, and thus the Bank was entitled to call the Loan Agreement on December 1, 1989.

#### 1. Default One: The Kabat Loan

Defendant argues that since Bogdanoff and Jeremy Friedman, Windsor's Chief Financial Officer, admitted that Windsor violated the negative covenant prohibiting it from incurring debt except as detailed by certain exceptions in Section 9–B of the Loan Agreement, Windsor "was in default of the Loan Agreement." Defendant's Memorandum at 12. The jury heard Bogdanoff testify that it was his impression that the Bank knew about the "Kabat loan."[13] *See, e.g.*, N.T. Oct. 11 at 40 (loan was similar to other violations of Loan Agreement that Bank never brought to Windsor's attention); N.T. Oct. 11 at 27–28

---

12. Defendant argues that since Bogdanoff told Mr. Strauss on November 27, 1989, that Windsor would pay the revolver down to "a million dollars" (N.T. Oct. 22 at 963), the Bank would have done exactly the same thing on January 1st, 1990, that it did on December 1st, 1989. *See* N.T. Feb. 3 at 6. This point is relevant only if one assumes that upon Windsor's failure to pay the revolver down to zero by December 31, 1990, the Bank would have done exactly what it did on December 1, 1990: Declare default and seize control of Windsor in order to insure that the entire revolver was paid off. There is no testimony that this is what the Bank would have done. In fact, since Mr. Strauss testified that the Bank's decision to declare the Loan Agreement in default was based on his belief that Bogdanoff told him that Windsor would pay the revolver down to $4 million (*See* N.T. Nov. 7 at 3077), there is simply no evidence as to what the Bank would have done on either December 1, 1989 or January 1, 1990 had they been under the impression that Windsor was going to pay

the revolver down to $1 million. Furthermore, as Plaintiff argued at N.T. Feb. 3 at 35, there was testimony from Pamela Hootkin that had Windsor asked for a one month extension on the $1.5 million owed PVH, it would have been granted (*see* N.T. Oct. 23 at 1293), and from Michael Kabat that Windsor could have borrowed up to $1 million from him in December if it had to cover short-term debt exposure (*See* N.T. Oct. 22 at 996–97). Therefore, Defendant's premise, that had the Bank not breached the Loan Agreement on December 1, 1989, Windsor would have defaulted on the Loan Agreement at the end of December, is simply speculation.

13. Michael Kabat, a friend and former business associate of Bogdanoff, lent Windsor $2 million in a series of installments during the summer of 1989. Windsor's apparent reason for borrowing money from Mr. Kabat was to make up for the $3 million loan that it anticipated borrowing from the Bank but never received. *See* N.T. Oct. 9 at 112.

("I told Tim Losch [an officer at the Bank] that I would get the money somewhere else [the Kabat loan]. He didn't tell me not to do it."); *see also* N.T. Oct. 9 at 152–53 (at August 1989 meeting Windsor discussed the Kabat Loan with Nancy Cleaver, its new loan officer). Plaintiff's attorney argued to the jury that the Bank was estopped from raising the Kabat loan as a default because it was told of the loan in May 1989, and knew of the loan from that point until its November 7, 1989 default letter was sent, and that it never raised the matter with Windsor until the default letter. *See* N.T. Nov. 14 at 3886–89. Plaintiff now argues that the jury may not have even reached the estoppel question: "[It] may have agreed with Windsor Shirt that the Kabat loan could not be seen as a default under the facts presented." Brief in Opposition to Defendant's Motion for Judgement Non Obstante Veredicto or New Trial (hereinafter "Plaintiff's Brief") at 26.

 Both sides have thoroughly briefed the law on estoppel. The traditional test for estoppel requires the plaintiff to prove "(1) a misrepresentation by another party; (2) which he reasonably relied upon; (3) to his detriment." *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir.1987), *citing Heckler v. Community Health Services of Crawford Cty.*, 467 U.S. 51, 61, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). New Jersey defines estoppel as:

> "Conduct amounting to a misrepresentation or concealment of material facts, known to the party allegedly estopped and unknown to the party claiming estoppel, done with the intention or expectation that it will be acted upon by the other party and on which the other party does in fact rely in such a manner as to change his position for the worse."

*Horsemen's Benev. and Prot. Ass'n v. Atlantic City Racing Ass'n*, 98 N.J. 445, 487 A.2d 707, 713 (1985), *quoting Carlsen v. Masters, Mates & Pilots Pension Plan Trust*, 80 N.J. 334, 403 A.2d 880, 883

(1979). In New Jersey, one is estopped if one is silent when one had a duty to speak, and "'in general, a person is required to speak only when common honesty and fair dealing demand that he do so....'" *Weiland v. Turkelson*, 38 N.J.Super. 239, 118 A.2d 689, 692 (App.Div.1955), *quoting Sanders v. Reid*, 131 N.J.Eq. 407, 25 A.2d 541, 543 (Ch.1942); *see also Jewish Center of Sussex Cty. v. Chaim Whale*, 165 N.J.Super. 84, 397 A.2d 712, 713 (Ch.Div. 1978) (*citing Weiland*), *aff'd* 172 N.J.Super. 165, 411 A.2d 475 (App.Div.1980), *aff'd* 86 N.J. 619, 432 A.2d 521 (1981). In New Jersey estoppel must be proved by "clear and convincing" evidence. *See Weiland*, 118 A.2d at 689; *see also* 4 A.L.R.3d 361, 370 (*citing Weiland*).[14]

Defendant argues that, under the New Jersey "clear and convincing evidence" standard, a jury verdict that the Bank was estopped from raising the Kabat loans as a default on November 7, 1989 is against the weight of the evidence. *See* Defendant's Memorandum at 14. The Bank's strongest argument is that "Windsor relies on Mr. Losch's and Ms. Cleaver's silence, rather than any affirmative statement to create an estoppel." *Id.*

The jury instructions included an explanation of estoppel and the "clear and convincing" standard adopted by New Jersey. *See* N.T. Nov. 15 at 4063–65. Neither party objected to the court's instructions. *See* N.T. Nov. 15 at 4084. It is clear from the evidence presented that it would not have been unreasonable for the jury to have found that the Bank did, in fact, make misleading representations through speech and/or silence, and that Windsor relied upon those misrepresentations to its detriment. Such a finding would allow the jury to conclude that the Bank was estopped from raising the Kabat loan as a default in November of 1989. The jury could have come to this conclusion in either of two ways.

---

**14.** The standard in Pennsylvania is proof by "clear, precise, and unequivocal" evidence. *Chrysler Credit Corp. v. First Nat. Bank & Trust Co.*, 746 F.2d 200, 206 (3d Cir.1984); *see also* 4 A.L.R.3d 24 (1991 supp.) (*citing Chrysler*).

### a. The Jury Could Have Concluded That the Bank Permitted the Loan

■ The jury heard testimony from Bogdanoff that Mr. Strauss, at a meeting with the Bank on June 21st, 1989, told Bogdanoff that the Bank had no intention of lending Windsor the $ 3 million Bogdanoff had expected, and that he should "[g]o borrow the money from a friend, we're not lending it to you." N.T. Oct. 9 at 147. This statement, if the jury believed it, was a misrepresentation: It either communicated to Bogdanoff that the Bank was waiving the requirements of Section 9–B of the Loan Agreement (which it could not do, as the Bank has argued, without consideration (*see* Defendant's Brief on Waiver and Estoppel at 3)), or it was stating that the Bank would not consider a violation of Section 9–B a default upon which it would exercise its rights, that is, that it would consider a loan from a friend a "technical" default.[15] The jury heard Mr. Turko testify that he had concluded, after a review of the Bank's credit file, that the Bank had consented to the Kabat loan, although he did not say who at the Bank had consented to it. *See* N.T. Oct. 24 at 1464.

■ Furthermore, the jury was permitted, under New Jersey law, to find misrepresentation if the Bank did not reveal a material fact that it was under a duty to reveal. The jury could have concluded that "common honesty and fair dealing" imposed a duty on the Bank to tell Windsor that it considered the loan a violation of Section 9–B. *See Weiland*, 118 A.2d at 692. The difficult question is not whether there was clear and convincing evidence that Windsor told the Bank about the Kabat loan: Not only could the jury have believed Bogdanoff's testimony of his conversations with Mr. Losch and Ms. Cleaver, but the jury also learned that Ms. Cleaver sent a memo on August 23, 1989 to Messrs. Bracken, Strauss, Manley, Weiss and Bellace—all of the major Bank employees in this case—stating that Bogdanoff borrowed $2 million and injected that money into Windsor.[16] The difficult question here is whether the jury was presented with clear and convincing evidence that the Bank ought to have known that Windsor was operating under the mistaken impression that the Bank permitted the Kabat loan. Here Mr. Strauss was the Bank's most damaging witness. He testified that he told Mr. Bogdanoff on June 21 to "get equity" from a friend, and not, as Bogdanoff testified, to borrow the money from a friend. *See* N.T. Nov. 7 at 2990. Mr. Strauss believed, therefore, throughout the summer of 1989, that Windsor understood his statement of June 21 as a suggestion to get equity. If that was the case, the jury could have therefore concluded that Mr. Strauss also knew, as of August 23, that Windsor had misunderstood him, since Ms. Cleaver informed him on that day that Bogdanoff got a $ 2 million loan, not a $. 2 million investment. Given the high cost to both the Bank and Windsor of the Loan Agreement going into default, "common honesty and fair dealing" placed on him a duty to inform Windsor of its mistake. The same analysis can be applied, although less dramatically, to Mr. Losch and Ms. Cleaver, both of whom, the jury could have concluded, were aware of Windsor's mistaken impression that it was permitted to borrow from Kabat. It is not unreasonable for the jury to have determined from the evidence presented that the Bank was under a duty to speak once it knew that Windsor had misunderstood the Bank's position on the Kabat loan, and that the

---

**15.** It in no way helps the Bank that Mr. Strauss told Bogdanoff to "go borrow the money" on June 21, 1989, which was after the June 16–18 period when Windsor received the first of the Kabat loans. *See* N.T. Oct. 9 at 143. The Bank is estopped from raising the loans as a default *after* June 21, since the jury could have found that Windsor would have had an opportunity to cure the violation before the Bank determined that it was a default (thus rendering the violation harmless) but for the Bank's misrepresentation.

**16.** Although the Cleaver memo says that Bogdanoff "personally" borrowed the money, Mr. Strauss's testimony makes it clear that, at least as of August 23, 1989, he (and presumably the Bank) knew that Windsor had borrowed money from Kabat. *See* N.T. Nov. 7 at 2991.

Bank's silence was a misrepresentation on which estoppel could be based.

### b. The Jury Could Have Concluded That the Kabat Loan Was a Technical Default

The other misrepresentation by the Bank that may form the grounds for a claim of estoppel is that the Bank misrepresented to Windsor its policy with regard to "technical defaults." Courts have been cautious about imposing contractual penalties for technical defaults. *See Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367, 1379 (9th Cir.1979) ("creditor accelerated not out of a reasonable fear of security impairment, but rather from an inequitable desire to take advantage of a technical default"). A trial court, however, cannot determine, as a matter of law, whether an alleged default was or was not technical. *See GNG XI, Inc. v. Quixoti Corp.*, 651 F.Supp. 68, 73 (E.D.Mo.1986) (trial court is not permitted to determine how substantial a default is). In this case, the jury could have concluded that the Bank had established, through a course of conduct and by its own testimony, that it would not declare the Loan Agreement in default on the basis of technical defaults alone, and that the Bank itself considered the Kabat loan to be a technical default.

Bogdanoff testified that there were various "technical" violations of the different loan agreements throughout Windsor's relationship with the Bank, and that these violations did not trigger a default letter: Instead, they were often clarified and corrected by a more informal communication. *See, e.g.*, N.T. Oct. 8 at 169 (no default letter as a result of technical violation of previous loan agreement with Bank); N.T. Oct. 8 at 177 (Bank continued previous loan's terms even after expiration without written agreement); N.T. Oct. 11 at 40 ("[Bogdanoff:] we had lots of times when loan officers waived things [technical defaults] that are in this agreement and are—and are evidenced by lots of little I and little fours and little threes and all those things ..."). Mr. Turko testified that the Bank called loans as a result of technical defaults only "from time to time." N.T.

Oct. 24 at 1473. When pressed, the only occasion Mr. Turko could recall of the Bank calling a loan of similar size for a technical default was in the case of a company in which the owners had been sent to prison for tax fraud, and in even that case, Mr. Turko admitted, the Bank did not present the company with the same stark choices it presented Windsor after the November 7 default letter: It permitted the company to work with the Bank and structure a new arrangement that permitted it to continue normal operations (as opposed to liquidation). *See* N.T. Oct. 24 at 1473–74.

The jury, therefore, could have concluded that the Bank had misrepresented its treatment of technical defaults to Windsor; further, it is clear that the jury could have concluded that Windsor relied on those misrepresentations. Finally, the jury could have concluded that the Kabat loan was a technical violation of the Loan Agreement: The Bank's cavalier treatment of the loan suggested as much (it waited between two and four months to bring the default to Windsor's attention). The best reason, of course, for the jury to conclude that the Kabat loan was a technical default is that Mr. Turko testified that it was:

Q: [I]n what category were all the defaults which were listed in the November 7 letter within the language used in the banking industry?

A: Technical.

N.T. Oct. 25 at 1603.

In sum, the jury found that the Bank could not have it both ways: If the violation of Section 9–B of the Loan Agreement was of great significance to Windsor's relationship with the Bank, then the Bank should have communicated with Windsor when it discovered that Windsor was mistaken in its impression of how the Bank regarded the violation of Section 9–B. On the other hand, if the Bank communicated to Windsor that the violation of 9–B was not going to significantly imperil the Loan Agreement, then it cannot complain when Windsor relied on that representation.

### 2. Default Two: Material Adverse Change In Windsor's Financial Position

Defendant argues that since Bogdanoff had testified that Windsor would not be able to pay down the revolver for thirty consecutive days beginning January 1, 1990, it would have been against the weight of the evidence for the jury to conclude that the fifth default in the November 7 default letter was not satisfied.

The factual predicate of this argument has been sufficiently discredited to allow the jury's opposite conclusion to withstand scrutiny. *See* note 12 *supra* (testimony of Ms. Hootkin that PVH would have granted an extension on repayment of debt; testimony of Mr. Kabat that Windsor could have borrowed $ 1 million in December on a short-term basis).[17]

### B. The Jury Could Have Found That Windsor Did Not Make a Valid And Enforceable Settlement With the Bank

■■■ The Defendant argues that Windsor and its lawyers met with the Bank and its lawyers on December 1, 1989, and signed a settlement agreement at which the Bank agreed to forbear pursuing its legal remedies in exchange for Windsor paying the revolver down by $ 3.5 million in December. *See* Defendant's Memorandum at 17.

When asked in oral argument at what point Windsor said that it would give up its legal rights against the Bank in exchange for the forbearance, Defendant could not point to any thing said at the December 1 meeting or memorialized in either the letter

sent by Bank's counsel to Windsor's counsel on December 4 (Exhibit D–25) or the letter of December 20 sent from Windsor's counsel to Bank's counsel (Exhibit D–131). *See* N.T. Feb. 3 at 15–16. The December 4 letter is not ambiguous on this point: It refers to "discussions in the future," not a settlement as of December 1 or 4.[18] The letter of December 20 is even less ambiguous: Windsor's lawyer specifically refers to the "arrangement that was *generally* reached on December 1" (emphasis added). Furthermore, none of the witnesses who testified about the December 1 meeting gave any indication that a settlement was offered, bargained for, or agreed upon. The jury was correct to reject the Bank's contention that a mutual settlement of all claims was reached on December 1, 1989: The obvious interpretation of the conversation between Mr. Strauss and Bogdanoff is that Mr. Strauss was dictating terms to Bogdanoff for Windsor's orderly liquidation, an option which the Bank clearly preferred in comparison to Windsor going into bankruptcy. *See* N.T. Oct. 25 at 1575 (Mr. Turko agreeing that the Bank normally attempts to prevent a client's bankruptcy since bankruptcy also harms the Bank's security); N.T. Oct. 10 at 19 (Bogdanoff stating that there was no discussion with any specificity on the part of the Bank about the legal rights possessed by the Bank, and therefore there could have been no agreement struck to waive those rights).

### C. The Jury's Damages Verdict Was Not Against The Weight Of the Evidence

Defendant argues that even if it cannot prove to this court that Plaintiff's damages

---

**17.** The jury may also have disbelieved the Bank's claim that Windsor had suffered a material adverse change, since the information the Bank offered in support of its conclusion (that Windsor would not pay its loan down in its entirety) was not learned by the Bank until *after* it came to the conclusion that Windsor had experienced a material adverse change. The jury heard testimony from which it could have concluded that the Bank had no knowledge of Windsor's alleged intention not to comply with the Loan Agreement until November 27, when the Bank called a meeting to discuss the November 7 letter and the defaults contained therein. *See* N.T. Nov. 7 at 3077 (Strauss recalling that Bogdanoff told him at November 27 meeting

that Windsor "was going to pay us down a million dollars").

While in theory it is possible that the Bank later found facts to justify its decision to call Windsor's loan, the jury has every reason to be skeptical of those facts when their source is a bank which admits that it claimed a default for which, at the time it made the claim, it had no factual support.

**18.** *See Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1012 (3d Cir.1980) (court may construe unambiguous documents as a matter of law).

case is so weak that the Bank is entitled to a Judgment As A Matter of Law, it may still prove that the jury's damages verdict was against the weight of the evidence. *See* Defendant's Memorandum at 19. The Bank's reasons, it concedes, are essentially the same as the reasons it adduced in its 50(a) motion and its motion for Judgment As A Matter of Law. This court's reasons for rejecting those reasons are equally applicable here: Plaintiff introduced sufficient facts from which the jury could reach to base the damages verdict it did. *See* Section III *supra*.

### D. Videotaped Testimony

Defendant argues that it is entitled to a new trial because it was not allowed to introduce into evidence a videotape showing, in an edited form, six separate depositions of Bogdanoff and Tom Elicker [19] taken in preparation for trial. Defendant argues that the videotape was admissible under the Federal Rules of Evidence, and that the court's refusal to even view the videotape in order to determine its probative value was a violation of Fed.R.Evid. 403, which requires that a judge weigh the probative value of proferred evidence before excluding it. *See* Defendant's Memorandum at 22.

#### 1. The Tape Was Not Admissible As a Deposition

 Defendant's request to introduce the videotape can be based on two separate arguments.[20] First, the Bank may have tried to introduce the videotape as the deposition of an officer of an adverse party, which both Bogdanoff and Mr. Elicker were. *See Fenstermacher v. Phil-*

*adelphia National Bank,* 493 F.2d 333, 338 (3d Cir.1974) (deposition of officer of adverse party can be used for any purpose at trial if admissible under rules of evidence); *see also* Fed.R.Civ.P. 32(a)(2). In oral argument, the Bank argued that its request to enter the videotape into evidence was based, in part, on its "rel[iance] upon the rules, which provide that a deposition of a party witness may be used for any purpose." N.T. Nov. 13 at 3762. However, as of November 13, 1991, the day the Bank asked to introduce the videotape, the videotape was not a deposition. A deposition is a record of testimony taken outside of the courtroom that has been certified in conformity with the Federal Rules of Civil Procedure so that a jury can regard it as equivalent to testimony delivered inside the courtroom under oath. *See, e.g., Black's Law Dictionary* 440 (6th ed. 1990) ("[deposition:] [T]he testimony of a witness taken ... not in open court ... intended to be used in preparation and upon the trial of a civil action ..."). This court clearly told the Bank in September 1991, when it sought permission to take deposition by videotape pursuant to Fed.R.Civ.P. 30(b)(4) (requiring either court order or stipulation by both parties) that it could record the deposition by videotape but that the court would decide later whether the videotape could be used in court. *See* N.T. Feb. 3 at 19 (Court: "It wasn't my intention that we play [the videotape] for the jury"). Until this court says that it intends the videotapes to be used in the trial, the videotapes of the Windsor depositions are not themselves depositions.[21]

**19.** Mr. Elicker was the controller of Windsor.

**20.** Defendant proffered the videotape at the end of its case-in-chief after it had called its last witness. *See* N.T. Nov. 13 at 3760.

**21.** One court has considered the problem of whether a judge can use Rule 30(b)(4) to order the videotaping of a deposition in which the videotape would be used for discovery but not at trial (although the transcript of the videotaped deposition could be used at trial). *See Roberts v. Homelite Div. of Textron, Inc.,* 109 F.R.D. 664 (N.D.Ind.1986). The court called the videotape ordered under such restrictions a "'discovery' deposition," denoting, one assumes,

that it was not a conventional deposition under the Federal Rules. *Roberts,* 109 F.R.D. at 667. It should be noted that the *Roberts* court, like this court, was willing to allow the videotape of a crucial deposition for discovery purposes, but was clearly wary about permitting that videotape to be used during trial. The *Roberts* court explicitly cautioned the movant that the reasons that would persuade the court to allow use of the videotape in trial were entirely different from the reasons upon which it was basing its order to force the nonmoving party to submit to a videotape "discovery deposition." *Id.; see also Kiraly v. Berkel, Inc.,* 122 F.R.D. 186, 188 (E.D.Pa.1988) (citing *Roberts*).

It is possible that the Bank is arguing that the court *should* have decided that the videotapes of the Windsor depositions were in fact depositions, thus allowing their introduction under Fed.R.Civ.P. 32(a)(2). Permission by the court to allow a deposition by videotape is not automatic: " 'Rule 30(b)(4) does not authorize the use of videotape ... by any party as of right.' " *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1176 (D.C.Cir.1985), *quoting Perry v. Mohawk Rubber Co.*, 63 F.R.D. 603, 604 (D.S.C.1974), *aff'd*, 529 F.2d 516 (4th Cir. 1976). A judge has the same discretion with regard to whether to order a nonstenographic deposition as with other discovery questions. *See UAW v. National Caucus of Labor Committees*, 525 F.2d 323, 326 (2d Cir.1975). The trial court's decision will be upheld unless it was an abuse of discretion. *See UAW*, 525 F.2d at 326; *Colonial Times, Inc. v. Gasch*, 509 F.2d 517, 521 (D.C.Cir.1975) (judge may not issue "outright rejection" without considering movant's argument); *Roberts v. Homelite Div. of Textron, Inc.*, 109 F.R.D. 664, 666–67 (N.D.Ind.1986) (despite some disagreement among federal courts as to meaning of "abuse of discretion" in cases concerning Rule 30(b)(4), "trial court has the same discretion which it enjoys in resolving all other discovery disputes").

### a. Reasons For Granting an Order Under Rule 30(b)(4)

In general, nonstenographic depositions have been ordered by courts for three different reasons. The most common, and least controversial, reason is that courts have found audio or videotaped depositions very useful in cases where the witness will not be able to attend the trial. *See Continental Federal S. & L. Ass'n v. Delta Corp.*, 71 F.R.D. 697, 702 (W.D.Okla.1976) (witness no longer within subpoena distance of court); *In re Daniels*, 69 F.R.D. 579, 581 (N.D.Ga.1975) ("In a situation where the plaintiffs seek the testimony of an essential witness who may not other-

wise be available for trial, the videotaped deposition should be allowed"). The advantages of preserving an audio or video version of the deposition of a witness who cannot testify at trial are obvious: "[A] recording, a video tape, or a motion picture of a deposition will avoid the tedium that is produced when counsel read lengthy depositions into evidence at the trial." 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2115 (1991 supp.) (hereinafter "Wright & Miller"); *see also Sandidge v. Salen Offshore Drilling Co.*, 764 F.2d 252, 259 n. 6 (5th Cir.1985) (*citing* Wright & Miller and collecting cases).[22]

Defendant extrapolates from the fact that courts have acknowledged the clear advantages of a videotape deposition over a stenographic deposition in the case of a non-present witness to the further claim that a court should, for that reason, permit the videotape deposition of a witness who will testify and be cross-examined in the presence of the jury. Defendant cites Judge Becker's concurrence in *U.S. v. Ismaili*, 828 F.2d 153, 170 (3d Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988), to support its claim that videotaped testimony may be equal to live testimony. Defendant's Memorandum at 20. Judge Becker—who, in *Ismaili*, is discussing a request by the government, under the Federal Rules of Criminal Procedure, to take a videotape deposition of an unavailable witness—did not say this.[23] Judge Becker maintains that since videotape is much better than the cold record, a videotape deposition is preferable to the "denial altogether of the testimony of a material witness." *Ismaili*, 828 F.2d at 170 (Becker, J., concurring). Judge Becker clearly opines that a videotape of a statement is less adequate than the live performance of that statement before the jury. *See Ismaili*, 828 F.2d at 170. Furthermore, in *United States v. Wilson*, 601 F.2d 95, 97 (3d Cir.1979), the case Judge Becker

---

**22.** In this case, of course, there was never any suggestion that Bogdanoff and Mr. Elicker would not be available to testify in person.

**23.** Fed.R.Crim.P. 15(d) permits depositions in accordance with the Federal Rules of Civil Procedure. *See United States v. Lafatch*, 382 F.Supp. 630, 632 (N.D.Ohio 1974).

cites in support of his conclusion, the Third Circuit Court of Appeals explains why:

> [Live testimony over depositions] is the favored method of presenting testimony ... [t]he antipathy to depositions is due to a large part to the desirability of having the factfinder witness demeanor. *Although this concern has been alleviated to a marked degree by the advent of modern audio-visual technology, the policy in favor of having the witness personally present persists.*

*Wilson,* 601 F.2d at 97 (emphasis supplied). The rule in our circuit is clear: a videotape deposition is usually better than a stenographic deposition when the witness cannot appear at trial; however, since demeanor is best judged by live testimony, live testimony is usually better than videotaped testimony.

The second reason courts have offered to justify an order under Rule 30(b)(4) is that nonstenographic depositions are less expensive than stenographic depositions. *See United States v. Hargro,* 104 F.R.D. 451, 452 (N.D.Ga.1984) (Rule 30(b)(4) should be construed "to facilitate the efficient and economic administration of justice"); *Lucas v. Curran,* 62 F.R.D. 336, 337 (E.D.Pa. 1974) (purpose of Rule 30(b)(4) "is to facilitate the effective participation of the economically disadvantaged in the federal courts"); Graham, *Nonstenographic Recording of Depositions: The Empty Promise of Federal Rule 30(b)(4),* 72 Nw. U.L.Rev. 566, 570 (1977) (hereinafter *"Nonstenographic Depositions"*) ("the Advisory Committee note [for the revision of Fed. R.Civ.P.] clearly states that rule 30(b)(4) is designed to 'facilitate less expensive' methods of taking depositions"). Professor Graham notes that, as of 1977, most courts granting nonstenographic depositions explicitly cited cost as the reason for their orders. *See Nonstenographic Depositions* at 571 nn. 28 & 29 (eight out of ten reported cases on this question "explicitly mention the desire to reduce costs").

■ Because videotaped depositions are often more expensive than either stenographic or audiotaped depositions, it is rare that cost alone could justify an order to permit a videotape deposition. *See Nonstenographic Depositions* at 586 ("district courts would find great difficulty justifying the use of videotape if they relied solely upon the Advisory Committee's rationale of less expense"). Regardless whether any given court concludes that videotape is more or less expensive than videotape's alternatives, expense is an important factor that courts have taken into consideration when weighing whether to order a videotape deposition under Rule 30(b)(4). *See Perry,* 63 F.R.D. at 606 (cost of videotape deposition one of the reasons for rejecting movant's motion); *and see Colonial Times,* 509 F.2d at 517 (since Rule 30(b)(4) "is designed to decrease everyone's stenographic costs whenever that can be accomplished," it was an abuse of discretion on the part of the district court not to hear movant's request for a videotape deposition). In this case, the Bank never mentioned financial considerations as a reason for allowing the videotape depositions.

The third reason courts have offered to justify an order under Rule 30(b)(4) is that videotape can capture the witness performing a demonstration that cannot be captured by stenographic means. In *Carson v. Burlington Northern, Inc.,* 52 F.R.D. 492, 493 (D.Neb.1971) the court ordered a videotaped reenactment of the plaintiff's injurious encounter with the defendant's steel press, "for the purpose of showing the manner in which plaintiff approached and operated the machine...." In *Kiraly v. Berkel, Inc.,* 122 F.R.D. 186, 187 (E.D.Pa.1988), the court ordered a videotape of the deposition in order to enhance the plaintiff's " 'recordation and memorialization process' " and so that the plaintiff could more accurately and usefully represent its recollection of an accident with a meat slicer (although the court left the question open as to whether this videotape would become a deposition and be used at trial *(see* note 21 *supra* )). *See also Roberts,* 109 F.R.D. at 667–68 *(citing Carson* to support order of videotape deposition where injury caused by lawnmower would be demonstrated). In this case, neither Bogdanoff nor Mr. Elicker demonstrated an accident or an event; at all times in the

deposition process the Bank inquired only into events that could be recounted through statements made by the deponents.

### b. This Court Should Not Have Ordered A Videotape Deposition

 This court will assume that the Bank was, in part, asking the court, under Rule 30(b)(4), to turn its videotape of the Bogdanoff and Elicker depositions into a videotape deposition, and that the Bank is now challenging the court's decision as an abuse of discretion. This court stands by its decision of November 13, 1991, to refuse to issue such an order.

The decision was not an abuse of discretion since the reasons proffered to this court by Defendant in support of an order under Rule 30(b)(4) were not like the three types of reasons outlined above. Defendant's reasons for seeking the order, to the extent that they have ever been fully articulated, have to do with its desire to capture on videotape the manner in which Bogdanoff and Mr. Elicker answered questions during deposition, with the intent that the images of Bogdanoff and Mr. Elicker would (1) "fatally undermine" Bogdanoff's credibility (see N.T. Feb. 3 at 21); and (2) show that Windsor's claim and evidence were "created" by its lawyer. See N.T. Nov. 13 at 3768. Defendant has described one segment of its edited videotape in which Bogdanoff is allegedly unable to answer "any questions" about Windsor's advertising decisions for 20 minutes to illustrate the videotape's value in bringing to the jury—as no transcript read aloud could—Bogdanoff's lack of credibility. See N.T. Feb. 3 at 21. Defendant, in an earlier motion, has described a videotape segment (which may or may not have been included in the proferred videotape) in which Windsor's counsel allegedly interferes with the deposition of Bogdanoff; interrupts Bogda-

noff to coach his answers and to encourage him to change his answers; until finally the attorney's "instructions start to appear in the transcript as if he were testifying, ahead of the witness." Memorandum In Support Of Continuation Of Videotape Depositions [sic] Under Conditions As Directed By The Court at 2–3.

 This court accepts the Bank's argument that its purpose in showing the videotape segment of Windsor's counsel "horseshedding" a witness was not to punish Windsor for its counsel's alleged ethical breaches. See N.T. Nov. 13 at 3768. The gravamen of the Bank's reasons for showing the videotape was that Bogdanoff perjured himself in the courtroom. It appears, however, that the Bank did not intend to use the videotape deposition to prove perjury by confronting Bogdanoff or Mr. Elicker with prior inconsistent testimony from the videotape of their depositions. This court comes to this conclusion because not only did the Bank evidence no intention to use the videotape during cross-examination, but also because at no point in its case-in-chief did the Bank ever raise a contradiction between the statements made in the corrected transcript of the deposition that was videotaped and Bogdanoff's trial testimony.[24] This court searched the record to locate any point in this trial where Defendant attempted to bring to the jury's or the court's attention a contradiction in Bogdanoff's or Mr. Elicker's testimony. There are a paucity of instances in the record concerning Bogdanoff and none concerning Mr. Elicker. For example, Defendant offers only one incident in which Bogdanoff changes his testimony, and in this case the contradiction was between a set of statements made at the same *deposition*. See N.T. Feb. 3 at 21. Similarly, during cross-examination, Defendant, after receiving an answer from Bogdanoff about Windsor's corporate structure, asked the witness if it took him 21 minutes to answer the same

---

**24.** A statement is either a verbal utterance or nonverbal conduct of a person, if it is intended by him as an assertion. *See* Fed.R.Evid. 801(a); *see United States v. Praetorius,* 622 F.2d 1054, 1065 (2d Cir.1979) (pointing with a finger is a statement if it was an act intended by the depo-

nent to convey information), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). Under *Praetorius,* it is unclear how much of Bogdanoff's alleged "inability" to answer a question can be considered a statement under Rule 801(a).

question during deposition; the Bank clearly wanted to show that Bogdanoff gave an adverse answer to this question during his deposition, yet the contradiction it ultimately revealed to the jury lay not between Bogdanoff's deposition and his testimony, but between his original answer in the deposition and a later correction of that answer (the correction was submitted before Bogdanoff signed the deposition, as permitted under Fed.R.Civ.P. 30(e)). *See* N.T. Oct. 10 at 74. Both of these examples have to do not with contradictions between deposition and trial testimony, but between various statements made by Bogdanoff during the deposition process. A party cannot *directly* attack the truthfulness of a statement testified to in court with proof that the witness has uttered other mutually contradictory statements outside of court. *Compare* Fed.R.Evid. 613(a) (prior statement of witness inconsistent with testimony is admissible) *with* Fed.R.Evid. 402 (mutually inconsistent out-of-court statements may be admissible as relevant evidence of falsity of a material fact testified to by witness) *and* Fed.R.Evid. 608(b) (specific instances of mutually inconsistent statements outside of court may not be introduced as evidence of character of witness except in the discretion of the court).[25]

It therefore seems clear to this court that ultimately the Bank wanted to use the videotape of the depositions not to contrast

any prior inconsistent statement made by the witnesses in his deposition with statements made at trial, but either as evidence of falsity of a material fact testified to by Bogdanoff or as evidence of character from which the jury could come to its own conclusion about Bogdanoff's character (i.e. his credibility) and, on the basis of either of these types of evidence, urge the jury to reject any statement of material fact made by the witness throughout the entire trial.[26]

As discussed above, courts have cited reasons to support granting a motion under Rule 30(b)(4): (1) The unavailability of witnesses, (2) the interest of the court in saving money, and (3) the need to illustrate on the record an event which cannot be adequately described through a statement by the deponent. As has been demonstrated above, the Bank's reason for requesting an order under Rule 30(b)(4) was either (1) it wanted to disprove trial testimony by introducing prior inconsistent statements by Bogdanoff, or (2) it wanted to introduce evidence about Bogdanoff's tendency to make inconsistent statements, either to directly attack the truthfulness of a fact based on his testimony, or to attack his character as a witness. As I will explain below, in neither case I see no need to extend the law surrounding Rule 30(b)(4) to include either of the Bank's reasons in this case.[27]

---

**25.** As will be explained below, this court doubts that Defendant's proffer of the entire videotape was proper under Fed.R.Evid. 401, since much of the deposition it wished to show (according to the Bank) did not contain evidence relevant to the truth of a material fact, but related instead to the credibility of a witness (*e.g.* Fed. R.Evid. 608(b)). *See infra* text accompanying note 37. On the other hand, the distinction is of no significance, since the sort of evidence the Bank sought to use to show that any material fact testified to by Bogdanoff was likely to be false was essentially identical to the sort of evidence it would have sought had it tried to impeach Bogdanoff's credibility: That his manner of answering questions outside of the courtroom evidenced a lack of credibility with regard to statements made at trial.

**26.** The Bank virtually conceded that this is their goal in oral argument:
[Bank's Attorney]: What the tapes would have shown that would have helped me is why I urged they be admitted. It would have shown

that the credibility of the critical witness for the plaintiff, Mr. Bogdanoff, would have been in my view fatally undermined if the jury had been permitted to see even a portion of the videotape.
. . . .
I believe that the credibility of Mr. Bogdanoff would have been totally undermined by the jury's seeing him testifying on videotape. N.T. Feb. 3 at 21–22.

**27.** In *Perry,* the court refused to grant a request for an order to compel a videotape deposition under Rule 30(b)(4) because the movant could not offer a rationale for his request:
Plaintiff ... has not urged any particular reason for this most unusual procedure. A review of the pleadings demonstrates that this litigation will involve, for the most part, evidence involving accounting procedures, information from records and items of like nature as to which there is no need for visual observation of the witnesses. This is not a tort

■ If the reason the Bank wanted this court to order Plaintiff to submit to a videotape deposition was to prove that Bogdanoff perjured himself at those points where the Bank believes that Bogdanoff offered trial testimony inconsistent with prior testimony in his deposition, then this court's decision to refuse to grant the Rule 30(b)(4) order was not an abuse of discretion. The issues about which the Bank claims Bogdanoff perjured himself were few in number, discrete, and easily identifiable in the deposition transcript. The trial lasted·19 days; Bogdanoff was on the stand for almost five days.[28] It is hard to understand why the Bank could not have adequately probed Bogdanoff's contradictions through questions based on the stenographic transcript at cross-examination if there really was perjury occurring before the jury.

■ If the reason the Bank wanted a videotape deposition was to offer to the jury evidence of Bogdanoff's tendency to make inconsistent statements, then it seems that this court's refusal to issue an order under Rule 30(b)(4) is even less an abuse of discretion than if the Bank's intent was to introduce a prior inconsistent statement. There is nothing in the cases reviewed above that suggests that an appropriate reason for ordering a videotape deposition is to allow the movant to provide the jury with information for the sole purpose of allowing the jury to conclude that the deponent's trial testimony is not credible. Obviously, information about the deponent which is inseparable from his statements must be received along with the statements in a videotape deposition if the court permits the videotape deposition. It would not be appropriate for a court to deny an otherwise meritorious request for a Rule 30(b)(4) order just because the depo-

nent did not want·his features observed. *See, e.g., In re Daniels,* 69 F.R.D. at 580 (witness who could not be present at trial was ordered to submit to a videotape deposition notwithstanding his fear that "the presence of a video tape camera ... would affect his concentration and the accuracy of his testimony and would result in the presentation of a demeanor to the jury which is false and unnatural").

This is consistent with the policy outlined by Judge Weis in *Wilson:* The best way to present a witness' statements to a jury is through live testimony. This is partly because it provides the jury the best opportunity to judge demeanor. However, if the only way the jury can receive a witness's statements is through a deposition, the next best way to present it is by videotape deposition, *even if* it means that the jury will—unavoidably—also receive disfavored information about credibility in the form of the witness' "demeanor on film." *See Wilson,* 601 F.2d at 97. But *Wilson* also teaches that if information about credibility in the form of "demeanor on film" is not a necessary by-product of some other legitimate end, a videotape should not be used. If the *reason* the Bank wants a videotape deposition of a witness is solely to put information about the witness in front of the jury at trial in the form of the witness's "demeanor on film" (as opposed to this information going in front of the jury as an unavoidable consequence of getting the witness' statements before the jury) then the Bank misunderstands what Judge Weis wrote. It was not an abuse of this court's discretion to refuse the Bank's request to order a videotape deposition where the sole reason for the order was to offer the jury information about Bogdanoff's credibility through viewing his demeanor on film.[29]

action requiring televising of an accident site or other immovable demonstrable evidence. Furthermore, for all that appears, those witnesses to be deposed will be presented in person during the course of this matter....
....
Plaintiff neither questions the efficacy of traditional stenographic recording nor complains of its costs....
*Perry,* 63 F.R.D. at 606–07. The parallels between *Perry* and this case are striking.

28. Bogdanoff's trial testimony covers 789 pages of the transcript: 338 pages of direct examination, and 451 pages of cross examination.

29. This court's decision to refuse to order Bogdanoff to submit to a videotape deposition is supported by Professor Graham's analysis of proposed amendments to Rule 30. The Committee on Discovery Practices for the Litigation Section of the American Bar Association ("Advisory Committee") proposed in 1977 that Rule

## 2. The Videotape Should Not Have Been Admitted Under the Federal Rules of Evidence

 The Bank may argue that even if it cannot introduce the videotape through Fed.R.Civ.P. Rule 32(a)(1), it can introduce it directly under the Federal Rules of Evidence.[30] The Bank argues that its proffered evidence was relevant, and the court erred in excluding the videotape under Fed. R.Evid. 403 (exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time). Defendant argues that this court's decision was arbitrary and thus an abuse of discretion. *See United States v. Robinson*, 560 F.2d 507, 515 (2d Cir.1977) ("the preferable rule is to uphold the trial judge's exercise of discretion unless he acts arbitrarily or irrationally"), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *see also In re Japanese Elec. Prods.*, 723 F.2d 238, 269–70 (3d Cir.1983) (determination under Rule 403 reviewed under abuse of discretion standard), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Defendant argues that the videotape was admissible and "unquestionably relevant" since "the videotapes would reveal that the theory of the case and some of the testimony were created by [Windsor's] counsel." Defendant's Memorandum at 22–23. From this the court may conclude that the videotapes were proffered under Fed.R.Evid. 401 (relevant evidence is admissible except as limited by Fed.R.Evid. 402). Defendant argues that the court wrongly concluded that the videotape's unfair prejudicial effect outweighed its probative value, and that the videotape was too time consuming. *See* Defendant's Memorandum at 24–26.

 The Bank argues that the court erred not only in its conclusion on the question of unfair prejudice, but also by choosing not even to look at the videotape to determine, by a balancing of "probative force and prejudice," the relevancy of the evidence. Defendant's Memorandum at 24, *quoting* 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 403[03] at 403–47 (1991) (hereinafter "Weinstein & Berger"). This court cannot find support for the Bank's last claim. In *United States v. Hearst*, 563 F.2d 1331 (9th Cir.1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978), the Ninth Circuit Court of Appeals held that a district court judge could apply Rule 403 to an audio tape proffered into evidence without listening to it. In *Hearst*, the defendant asked to play a 1 hour and

30(b)(4) be modified to allow a party to elect to conduct a nonstenographic deposition without *any* notice to the court, although the deposed party would be allowed to ask the court to order a stenographic deposition. *See Nonstenographic Depositions* at 589. Professor Graham noted that along with the change to Rule 30(b)(4), the Advisory Committee suggested the following significant change to Rule 30(e) (the section entitled "Submission to Witnesses; Changes; Signing"):

> If the recording or transcription thereof is to be used at trial as *substantive evidence* such recording or transcription shall be submitted to the witness and counsel for the opposing parties for examination....

*Id.* at 589, *quoting* the minutes of the Advisory Committee (Mar. 26, 1977) (emphasis supplied). Professor Graham further notes that the mention of the phrase "substantive evidence" raises a question: This was the first time there was any indication in any part of Rule 30 or its commentary that the Rules envisioned "having recorded depositions employed at trial.... [Not for] the introduction of a deposition of an unavailable witness ... [but] to impeach a witness pursuant to Rule 32(a)(1)." *Id.* at 590.

Professor Graham concludes that the Advisory Committee intended with these proposed amendments to expand the use of nonstenographic depositions beyond their permitted use under the current rules. We should note that Professor Graham expressed his skepticism that "federal judges will be receptive to the playing of such recordings at trial as part of the witness impeachment process." *Id.* at 591–92. To date, these amendments have not been adopted.

**30.** The videotape of the depositions, if it was not a videotape deposition under Fed.R.Civ.P. 30(b)(4) is just a videotape that happens to be in the Bank's possession, just like any other document or thing that it might wish to introduce into evidence. *See United States v. Ebens*, 800 F.2d 1422, 1430 (6th Cir.1986) (tape recording of interview by lawyer with witness who is not lawyer's client admissible under Fed.R.Evid. 801(c)). The fact that the Bank attempted to have the videotape accepted as a deposition does not affect this analysis. *See Guccione v. Hustler Magazine, Inc.*, 632 F.Supp. 313, 320 (S.D.N.Y. 1986) (witness's stenographic deposition from another case admitted under Fed.R.Evid. 608(b) and 801(d)(2)(D)), *rev'd on other grounds*, 800 F.2d 298 (2d Cir.1986).

45 minute audio tape of an interview between the defendant and a witness who had testified at trial as to the mental state of the defendant. The government objected that the tape was cumulative, since the witness could simply discuss the tape on direct examination, and that playing the tape would take too much time. The trial judge agreed. *See Hearst*, 563 F.2d at 1348. Hearst appealed, arguing that the district court's refusal to allow the tape to be played to the jury was an abuse of discretion. One of Hearst's argument to the court of appeals for reversal was "the ground that the court did not listen to the tape or read the transcript before ruling." *Hearst*, 563 F.2d at 1349 n. 14. The Ninth Circuit Court of Appeals rejected this argument, noting that:

> [While it may be] better practice for the district court to examine proferred evidence before ruling on its admissability, the circumstances involved here render the district court's approach unobjectionable. The court was made aware of the general content of the ... interviews by [the witness's] testimony regarding them during trial.

*Hearst*, 563 F.2d at 1349 n. 14.

The district court in *Hearst* based its evidentiary ruling on the grounds that the tape of the interview was cumulative and too time-consuming, and this court based its decision on the grounds that the videotape deposition was prejudicial and too time-consuming: The standard used by the court in *Hearst* to determine if the audio tape was cumulative and time-consuming should be the same standard used by this court to determine whether the proferred videotape is prejudicial and time-consuming. Furthermore, like the judge in *Hearst*, this court not only allowed the movant to familiarize the court with the contents of the videotape, it also assumed, for the purposes of making this ruling, the truthfulness of the movant's description of

the contents of the videotape. *See* N.T. Nov. 13 at 3769 (Court [to Bank]: "I'm assuming it's [the videotape] as you say it is").[31] Therefore, while it may be the case that this court erred in its decision to reject the videotape as proferred evidence, Defendant must prove the error by attacking the court's reasons for rejecting the videotape; not the court's decision not to view the tape.[32]

The Bank's substantive argument that the court's application of Rule 403 was an abuse of discretion is based on five objections. They are as follows: (1) The court erred in concluding that the videotape, in showing Windsor's lawyer in a bad light, would unfairly prejudice the jury against Windsor. Defendant's Memorandum at 23. (2) The court erred in concluding that, even if there were some prejudice inseparably bound up in playing the videotape, the prejudice substantially outweighed the probative effect of the evidence. *Id.* at 24. (3) The court erred in assuming that the probative value of the videotape could be communicated to the jury through other means. *Id.* at 24–25. (4) The court erred in concluding that no limiting instructions associated with the viewing of the videotape could cure the videotape's evidentiary problems. *Id.* at 25. (5) The court erred in concluding that the additional trial time taken up by the viewing of the videotape did not justify playing the tape. *Id.* at 25–26.

■ Before this court reviews the facts that support any of the five reasons the Bank raises in its Motion, the court must step back and evaluate the probative value of the videotape as evidence. Defendant argues that the videotape is relevant evidence because it would show that the theory of the case and some of the testimony were created by Windsor's counsel. First of all, the claim that any evidence is relevant because it would prove that a party's

---

**31.** In *Hearst,* the Ninth Circuit Court of Appeals did not find that the judge erred in rejecting an audio tape quite similar in length to the videotape at issue in this case, notwithstanding the fact that the Hearst trial, like this case, was lengthy and complex.

**32.** This analysis is also responsive to Defendant's argument that in refusing to view the proffered videotape before making its evidentiary ruling, the court denied the Bank "due process." *See* N.T. Nov. 13 at 3765; Defendant's Supplemental Brief at 8.

counsel "created" the "theory of the case" that is the basis of litigation is not supported by the law. Fed.R.Evid. 401 refers only to "any fact that is of consequence of the determination of the action."[33] The facts surrounding the genesis of the "action" is irrelevant to the merits of the "action."[34] It is the job of counsel to help a party to determine how to vindicate his legal rights through a cause of action; this court cannot conceive of how counsel can achieve this end without helping to create—or entirely creating—a theory of the case on which the client's cause of action is based.

The other reason the Bank offers for the videotape's relevance is that it would have a "tendency to make the existence of [the] fact" that some of the testimony was created by Windsor's counsel "more probable." Since Defendant knows, and has been told, that the appropriate response to discovery of the fact that Windsor's counsel manufactured testimony would be to move for sanctions (*see* N.T. Nov. 13 at 3766–67), the Bank must be arguing that, in proving that Windsor's counsel manufactured testimony, it by necessity will prove

that a witness (Bogdanoff) delivered manufactured testimony, and that this fact is relevant to the case under Rule 401.

The assertion that Bogdanoff delivered false testimony is probably in itself relevant. Although the law has established means by which to punish a witness who perjures without necessarily introducing evidence about that perjury into the trial of the party on whose behalf the witness testified, it is not difficult to see why the Bank might want to draw the jury's attention to its allegation that Bogdanoff "manufactured"—invented—some portion of his testimony.[35] Defendant, of course, was never denied the opportunity of directing the jury's attention to any prior inconsistent statements by Bogdanoff; under Fed. R.Evid. 801(d)(1) or (2), Bogdanoff's *statements* in the deposition transcript could have been read to him and contrasted with his current answer in order to evidence for the jury his perjury.[36]

According to Defendant's own proffer, the videotape, however, does not reveal that Bogdanoff offered inconsistent testimony. The videotape shows that Bogdanoff (1) contradicts himself during depo-

33. Fed.R.Evid. 401 provides:
 "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

34. Of course, if the client violated any law and/or his lawyer violated any law or provision of the Code of Professional Ethics, each would be answerable under separate charges for those violations.

35. The Bank can certainly argue that the fact (if proven) that Bogdanoff lied about material fact Q is important to the determination of the case because if the jury had believed that the truth about Q was otherwise, it would probably have returned a different verdict. The Bank can further argue that the fact that Bogdanoff lied about material fact Q is important to the determination of the case because the Bank could have argued to the jury that Bogdanoff's alleged act of perjury supports the Bank's contention that Bogdanoff lied about material facts R through Z (which are related in some way to fact Q), and that had the jury believed otherwise about those facts, its verdict would have been otherwise. The Bank might even have been able to argue that the fact that Bogdanoff lied

about material fact Q is important to the determination of the case because the Bank could have argued to the jury that Bogdanoff's alleged act of perjury supports the Bank's contention that there was an equal probability that any portion of Bogdanoff's testimony was manufactured, and that had the jury believed otherwise about any part of Bogdanoff's testimony, its verdict would have been otherwise. (This last argument assumes that some relationship could be drawn between fact Q and the set of all facts testified to in trial other than the trivial fact that they are all facts testified to by the same person.)

36. The Bank does not suggest that a juror's ability to recognize that a statement made under oath in deposition is inconsistent with a statement made in court is affected by whether the deposition statement is presented in court on a videotape or through stenographic transcript. The Bank would be wrong to pursue this suggestion, since it is clearly false: The inconsistency of two statements is a function of a contradiction between the words contained in each statement. Whether or not one believes the truthfulness of the speaker who uttered the words contained in two consistent statements made in testimony is irrelevant to the fact that the two statements are consistent.

sition, and (2) exhibits behavior strongly indicative of the fact that he has no reliable knowledge of the facts to which he is testifying. Since one can change or alter one's deposition transcript until one signs it (pursuant to restrictions under Fed.R.Civ.P. 30(e)), the fact that Bogdanoff's answers during deposition were inconsistent can in no way be offered to the jury as evidence of prior inconsistent testimony, although Bogdanoff can be asked about the reasons for those changes during cross-examination. Nonetheless, if Defendant wished to ask Bogdanoff about his decision to correct the transcript of his deposition before signing it, this inquiry could have been conducted without any loss of effectiveness through questioning based on a stenographic transcript. *See* note 36 *supra*.

 The only unique information the videotape could have provided the jury, therefore, was the "fact" that during deposition, Bogdanoff exhibited behavior that strongly indicated that he had no reliable knowledge of the facts upon which he was testifying. This "fact" is not a fact relating the inconsistency of testimony. This "fact" conveys information about the demeanor of the speaker of a statement that will become, but is not yet, testimony. The Bank is arguing that a juror could infer from a speaker's untrustworthy demeanor in the course of preparing statements that will become testimony that a statement in testimony that reflects the preparatory statements which were associated with the

untrustworthy demeanor is false, and that on the basis of this "fact," that any statement made by that speaker in testimony has a significant probability of being false.[37]

Therefore, the Bank must employ a two step process to get visual information about Bogdanoff's demeanor into evidence under Rule 401. First, the Bank must show that the visual information contained in the videotape tends to establish the fact that Bogdanoff lied about a material fact during trial. Second, the Bank may then argue that the fact that Bogdanoff lied about a material fact during trial, if believed, would be relevant under Rule 401 for the reasons adduced above. If the Bank's proffer is evaluated against the background of this two step process, it becomes clear that some of the videotape is clearly relevant under Rule 401 and some may be relevant, but not unambiguously so.

. This analysis confronts the Bank with the following problem: The portions of the tape that are most obviously relevant under Rule 401 are also the portions most easily communicated to the jury by other means, while the portions that are the least obviously relevant are the portions which, it appears, the videotape so "dramatically" captures. *See* N.T. Nov. 13 at 3766. At one extreme, for example, where the videotape shows Bogdanoff contradicting himself at two separate moments, or unable to answer a question, it seems that little probative value would have been lost had Bog-

---

37. The Bank must connect the allegation that Bogdanoff lied when he made those statements it associates with the exhibition of an untrustworthy demeanor with an allegedly false statement that Bogdanoff actually committed to testimony when he signed his deposition. This is because the Bank cannot argue that the fact that a witness has lied in a statement unrelated to testimony makes it more probable that the witness has lied about any fact offered in testimony. That is an attack on the witness's credibility through the specific instance of conduct. *See* Fed.R.Evid. 608(b). Although Rule 401 allows that "evidence [not directly related to the proof of a fact] ... may be admitted to evaluate the credibility of a witness," Weinstein & Berger at 403–31, the evidence of credibility must be connected to some specific fact testified to by the witness. *See Murphy v. Cincinnati Ins. Co.*, 772 F.2d 273, 277 (6th Cir.1985) (fact that policy-

holder was willing to take polygraph test relevant to prove credibility with regard to insurance claim upon which policyholder testified).

Nonetheless, it is clear that Rule 401 and Rule 608(b) may, in fact, be used to admit almost identical information regarding the impeachment of witnesses. *See United States v. Alvarez–Lopez*, 559 F.2d 1155, 1158 (9th Cir.1977) ("The Evidence Code does not attempt to write a catalog of all the rules which govern evidence that can be used to impeach a witness. Rather, the code only attempts to lay down a few specific rules dealing with the situations in which impeachment upon collateral matters may be particularly subject to potential abuse, and in those situations, to give substantial discretion to the trial judge in admitting or excluding the impeaching evidence."); *see also United States v. Lehr*, 562 F.Supp. 366, 375 n. 11 (E.D.Pa.1983), *aff'd* 727 F.2d 1100 (3d Cir.1984).

danoff's spoken answers been communicated to the jury through the reading of a stenographic deposition transcript at cross-examination just after Bogdanoff made a statement the Bank believed was a material falsehood. On the other hand, at the other extreme, where the videotape captures (in an admittedly unique manner) the nonverbal event of Bogdanoff being coached by Windsor's counsel, or stuttering and stammering out an answer, or perspiring and looking altogether untrustworthy, the problem is that the "fact" proven by these events—that the probability is high that any statement made by Bogdanoff during trial is false—is so speculative and vague, that the evidence designated to prove this "fact" has little probative value.

The circumstances surrounding the introduction of the videotape were not auspicious: The Bank introduced the videotape at the end of its case-in-chief after it called its last witness; referred to the videotape only once before in cross-examination; had not up to that point suggested that it believed that there was evidence that there was a good probability that any one of Bogdanoff's material trial statements were false; and had laid no foundation up to that point for argument the that the tape would prove, through proof of material falsehood captured on videotape, that there was a good probability that any one of Bogdanoff's material trial statements were false and the result of the fabrication by Windsor's counsel. With these factors in mind, this court concluded that the probative value of the evidence that was uniquely conveyed by the videotape was on the low end of the range described above.

Having explained why this court awarded the videotape proffered by the Bank low probative value, the court will now explain why it properly concluded, under Rule 403, that the proferred evidence's low probative value was outweighed by other relevant considerations.

The potential for unfair prejudice to Windsor was very high, given that the Bank's contention that Bogdanoff had fa-

bricated testimony was based on its belief that Windsor's counsel had originated and participated in the "fabrication." Given that this was the basis upon which the Bank wanted to convince to the jury that Bogdanoff's testimony was generally unreliable, it is hard to imagine how the videotape could not be used for the purposes set out by the Bank in its motions without it constantly directing the jury's attention to Windsor's counsel's alleged wrongdoing.

Given that the Bank intended to prove to the jury that Bogdanoff made material misrepresentations *because* Windsor's counsel violated the law and the Code of Professional Ethics, the impact of the videotape would be dramatic and not easily cured by a limiting instruction. Second, as explained above, this court did not assume that the all the evidence contained in the videotape could be conveyed through other means; however, it did assume that some of the evidence in the videotape could be communicated through cross-examination based on the stenographic record, and that some of the evidence in the videotape would be lost if converted to stenographic transcription. This court did, therefore, conclude that the evidence that could be communicated only by videotape was of significantly less probative value than the evidence that could be communicated by stenographic means.

Furthermore, as has been already shown in the discussion of *Hearst*, it was not inappropriate for this court to refuse to admit videotaped evidence of low probative value because it would consume too much trial time, even if the trial was long and complex. *See* note 31 *supra*. In this case, the court was especially concerned over the fact that the Bank chose not to proffer the videotape until the end of the trial, instead of during cross-examination, which would have been the most obvious point in the trial for its introduction (assuming that the videotape had a legitimate role in this trial at all).[38]

Finally, it must be noted that it is unclear to what extent information relating to Bog-

---

**38.** Cross-examination of Bogdanoff ended on the sixth day of trial, October 23, and the Bank proffered the videotape on the 17th day of trial, November 13.

danoff's credibility would have mattered to the outcome of this case. When Plaintiff's original complaint included allegations of "tortious breach of contract," fraud, and a request for significant punitive damages, the jury would have been asked to choose Mr. Bogdanoff's version of events over a conflicting version presented by the Bank. However, because this court dismissed everything but Windsor's breach of contract claim, very little of the jury's factfinding relied on statements relating to events to which Bogdanoff was Windsor's sole witness. Ultimately, most of this case turned on the jury's evaluation of actions whose outward descriptions were not in dispute.[39] Drawing the jury's attention to Bogdanoff's demeanor during deposition would not have helped the jury to grapple with the heart of this case.

Given these reasons, this court did not err in excluding relevant evidence of low probative value because of its concern for prejudicial effect and the time constraints presented by the trial.[40]

### E. Mr. Strauss Was Properly Excluded From the Courtroom

On October 10, 1991, Plaintiff made a sequestration request which this court granted pursuant to Fed.R.Evid. 615. *See* N.T. Oct. 10 at 2. The court permitted Mr. Turko to remain in the courtroom pursuant to Fed.R.Evid. 615(2) (an officer of a party which is not a natural person may be designated by the party's counsel as its representative). On October 11, 1991, Defendant objected to the sequestration of Mr. Strauss on two grounds. First, the Bank argued that Fed.R.Evid. 615(3) permitted "a person whose presence is shown by a party to be essential to the presentation of the party's case" to be exempt from a

sequestration order. *See* N.T. Oct. 11 at 3. Second, the Bank argued that Rule 615 may be unconstitutional:

> [T]his is no quarrel with your Honor's interpretation of the rule—but ... the rule itself constitutes, as applied to these facts, a deprivation of due process of law, equal protection of the laws and the protected right [under Pennsylvania law] ... to consult with counsel.

 This court will not accept the Bank's invitation to declare Rule 615 unconstitutional under the United States Constitution. This court shall, however, explain its reasons for refusing to recognize Mr. Strauss as a witness whose presence was "essential" to the Bank's case.

Although it is error for a district court to sequester a witness who is essential to a party's cause, the party who wishes to lift the sequestration order from a witness bears the burden of "supporting that allegation." *Government of Virgin Islands v. Edinborough*, 625 F.2d 472, 476 (3d Cir. 1980). The moving party must "show[ ] that the witness 'has such specialized expertise or intimate knowledge of the facts of the case that a party's attorney could not effectively function without the presence or aid of the witness....' " *U.S. v. Agnes*, 753 F.2d 293, 307 (3d Cir.1985), *quoting Oliver B. Cannon and Son v. Fidelity and Cas. Co.*, 519 F.Supp. 668 (D.Del.1981).

The word "essential" connotes necessary; not preferable, or "better than some other state of affairs": That is why the exception in Rule 615 has most often been granted in cases where the sequestered witness is an expert of some sort—either an expert witness, or a lay witness who is also a lawyer or accountant. *See, e.g.,*

---

**39.** The liability of the Bank was proved, to a great extent, by reference to the Bank's internal documentation, and the damage assessment was established, to a large degree, by Mr. Klatsky's testimony.

**40.** A final reason for not permitting the proferred videotape to be admitted under Rule 401 is that it would moot this court's decision to refuse to order a videotape deposition pursuant to Fed.R.Civ.P. 30(b)(4). *See* Section IV. D. 1. *supra.* If a movant could obtain permission

pursuant to Rule 30(b)(4) to videotape a deposition for discovery purposes but not for use during trial, and then introduce that videotape into evidence under Fed.R.Evid. 401, the judge's decision to allow videotaping of a deposition for discovery only is rendered empty and unenforceable. The result will be, of course, judges choosing to allow the videotaping of depositions under Rule 30(b)(4) only when they would accept the resulting videotape for use in trial.

*Cannon,* 519 F.Supp. at 678 (court lifted sequestration for expert and lay witness who was an attorney); *see also Morvant v. Construction Aggregates Corp.,* 570 F.2d 626, 629–30 (6th Cir.1978), *cert. dismissed,* 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978) (expert witness is not automatically exempt from sequestration under Rule 615(3)). In this case, it is hard to see in what way Mr. Strauss was essential to the Bank's counsel in this case. It is unclear what difference it made that "Mr. Strauss possessed specialized expertise in banking areas that differed from Mr. Turko's specialties." Defendant's Memorandum at 28. It is probably true that all of the Banks' witnesses possessed different levels of skill in various material areas. Defendant stresses that Mr. Strauss necessarily had "intimate knowledge" of facts not available to Mr. Turko since he attended meetings that Mr. Turko did not attend. *Id.* at 29. It is clear from the cases above that the least weighty reason for considering a witness "essential" to a case is the factual knowledge he possesses; knowledge of facts at issue in the case is not expertise and can easily be communicated before and after trial.

One reason for this court's skepticism of the Bank's claims that Mr. Strauss was "essential" to its case is that when the Bank told the court of its concern over Mr. Strauss' exclusion from the courtroom, the court offered, over Windsor's objections, to allow the Bank to replace Mr. Turko with Mr. Strauss. *See* N.T. Oct. 11 at 6. There was never any indication from the Bank that Mr. Strauss could not perform Mr. Turko's job as the Bank's representative in court under Fed.R.Evid. 615(2) *and simultaneously* provide the "essential" services to his company that, according to Defendant, only Mr. Strauss could supply. Yet the Bank chose to forego Mr. Strauss' presence, which it deemed "essential," in exchange for Mr. Turko's presence, whose ability to serve under Rule 615(2) was apparently no better than Mr. Strauss'. *See* N.T. Oct. 11 at 7.

This court's decision to reject Defendant's Rule 615(3) request to lift Mr.

Strauss' sequestration order was not erroneous.

### V. *Conclusion*

For the reasons set forth in the foregoing sections, Defendant's Motion For Judgment As a Matter Of Law, or, in the alternative, For a New Trial is denied.